**PUBLISHED**

# UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

CHILD EVANGELISM FELLOWSHIP OF
MARYLAND, INCORPORATED, a
Maryland not-for-profit corporation;
CHILD EVANGELISM FELLOWSHIP OF
NORTHWEST MARYLAND, a Maryland
association,
                     *Plaintiffs-Appellants,*

                   v.

MONTGOMERY COUNTY PUBLIC
SCHOOLS; JERRY D. WEAST, in his
official capacity as Superintendent
of Montgomery County Public
Schools; PATRICIA O'NEILL; SHARON
W. COX; KERMIT V. BURNETT;
REGINALD M. FELTON; CHARLES               No. 03-1534
HAUGHEY; WALTER N. LANGE; GABE
ROMERO, in their official capacities
as members of the Board of
Education for Montgomery County,
                     *Defendants-Appellees.*

CLIFTON KIRKPATRICK, as Stated
Clerk of the Presbyterian Church;
NATIONAL ASSOCIATION OF
EVANGELICALS; AL BLACK; RHONDA
BLACK, as Parents and Next Friends
of Eric Black; UNITED STATES OF
AMERICA; JOSEPH J. HILLS;
                     *Amici Supporting Appellants,*

NATIONAL SCHOOL BOARDS
ASSOCIATION; MARYLAND
ASSOCIATION OF BOARDS OF
EDUCATION; NATIONAL PARENT
TEACHER ASSOCIATION; AMERICAN
ASSOCIATION OF SCHOOL
ADMINISTRATORS; MONTGOMERY
SOCCER, INCORPORATED; AMERICANS
UNITED FOR SEPARATION OF
CHURCH AND STATE; THE ANTI-
DEFAMATION LEAGUE; PEOPLE FOR THE
AMERICAN WAY; NATIONAL
EDUCATION ASSOCIATION; AMERICAN
CIVIL LIBERTIES UNION OF THE
NATIONAL CAPITAL AREA; AMERICAN
CIVIL LIBERTIES UNION
FOUNDATION OF MARYLAND,
            *Amici Supporting Appellees.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CA-03-162-8-PJM).

Argued: September 24, 2003

Decided: June 30, 2004

Before MICHAEL, MOTZ, and SHEDD, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Motz wrote the
opinion, in which Judge Shedd joined. Judge Michael wrote a sepa-
rate dissenting opinion.

---

## COUNSEL

**ARGUED:** Nathan Aldrich Adams, IV, RELIGIOUS LIBERTY ASSOCIATES CHRISTIAN LEGAL SOCIETY, Annandale, Virginia, for Appellants. Gregory George Garre, Civil Rights Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae United States. Judith S. Bresler, REESE & CARNEY, L.L.P., Columbia, Maryland, for Appellees. **ON BRIEF:** Kimberlee W. Colby, Gregory S. Baylor, RELIGIOUS LIBERTY ASSOCIATES CHRISTIAN LEGAL SOCIETY, Annandale, Virginia; H. Robert Showers, SIMMS SHOWERS, L.L.P., Leesburg, Virginia, for Appellants. Ralph F. Boyd, Jr., Assistant Attorney General, David K. Flynn, Eric W. Treene, Angela M. Miller, Civil Rights Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae United States. Eric C. Brousaides, REESE & CARNEY, L.L.P., Columbia, Maryland, for Appellees. Douglas Laycock, Austin, Texas; Scott J. Ward, Stephen S. Kao, GAMMON & GRANGE, P.C., McLean, Virginia, for Amici Curiae Kirkpatrick, et al. Jay Alan Sekulow, Walter M. Weber, AMERICAN CENTER FOR LAW AND JUSTICE, Alexandria, Virginia, for Amicus Curiae Hills. Julie Underwood, General Counsel, NATIONAL SCHOOL BOARDS ASSOCIATION, Alexandria, Virginia; Maribeth Oakes, Director of Legislation, NATIONAL PTA, Chicago, Illinois; Leon Reed, President, MONTGOMERY SOCCER, INC., Rockville, Maryland; Stephen C. Bounds, Director of Legal & Policy Services, MARYLAND ASSOCIATION OF BOARDS OF EDUCATION, Annapolis, Maryland; Bruce Hunter, Associate Executive Director, Public Policy, AMERICAN ASSOCIATION OF SCHOOL ADMINISTRATORS, Arlington, Virginia, for Amici Curiae School Boards, et al. Ayesha N. Khan, Ilana R. Fisher, AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, Washington, D.C.; Steven M. Freeman, Steven C. Sheinberg, ANTI-DEFAMATION LEAGUE, New York, New York; Elliot M. Mincberg, Judith E. Schaeffer, PEOPLE FOR THE AMERICAN WAY FOUNDATION, Washington, D.C.; Michael D. Simpson, NATIONAL EDUCATION ASSOCIATION, Washington, D.C.; Arthur B. Spitzer, AMERICAN CIVIL LIBERTIES UNION OF THE NATIONAL CAPITAL AREA, Washington, D.C.; David Rocah, AMERICAN CIVIL LIBERTIES UNION OF MARYLAND, Baltimore, Maryland, for Amici Curiae Americans United, et al.

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

Child Evangelism Fellowship of Maryland, Inc. ("CEF") brought this suit to obtain access to certain established communication forums in public elementary schools. The district court refused to issue a preliminary injunction requiring a school district to permit CEF access to the district's take-home flyer forum in order to distribute Good News Club flyers. The court believed that allowing CEF this access might constitute an unconstitutional establishment of religion and, for this reason, found that CEF had failed to demonstrate the necessary likelihood that it would ultimately succeed on the merits. Controlling precedent, however, strongly indicates that permitting CEF access to this forum does not run afoul of the Establishment Clause. Thus, CEF has demonstrated a clear likelihood of success on the merits. Accordingly, we must reverse and remand for further proceedings.

I.

CEF describes itself as a non-profit "Bible-centered, worldwide organization composed of born-again believers whose purpose is to evangelize boys and girls with the Gospel of the Lord Jesus Christ and to establish (disciple) them in the local church for Christian living." As one of its functions, CEF establishes Good News Clubs that meet in elementary schools throughout the country. During these meetings, the "children recite Bible verses, sing songs, play games, learn Bible stories, and pray under the leadership of trained staff who primarily are volunteers." Beginning in 1996, the Good News Club began holding after-school meetings in the elementary schools of Montgomery County, Maryland and currently holds meetings at two schools in that school district — Mill Creek Towne Elementary School and Clearspring Elementary School.

The Montgomery County Public School District ("the District") operates 125 elementary schools. The District permits certain governmental and non-profit organizations to use the "take-home flyer forum" in those schools to distribute flyers and permission slips for students to take home to their parents. Although the record reveals conflicting testimony regarding what policy (if any) actually guides

school administrators' discretion in granting access to this forum, community groups clearly must obtain prior administrative approval to use the forum. If approved, the organization is responsible for supplying the requisite number of flyers at its own expense.

The method of distribution varies among the schools in the District, but Mill Creek and Clearspring Elementary School employ the same basic procedure. Either a representative of the community group or the District office staff places the flyers in the teachers' mailboxes, generally after receiving permission from the school's principal. The teachers retrieve the flyers from their mailboxes and either personally deliver them to the students or the students' cubbies, or have a teacher's aide or student do so. The distribution of flyers typically occurs at the end of the school day. Students are expected to bring home all items from their cubbies including student art work, homework, classwork, other school related information, and the flyers. But nothing in the record indicates that students receive any punishment for failing to bring flyers home and parents are not required to acknowledge receipt of the flyers.

In August 2001, CEF sought to have a flyer notifying parents of the Good News Club meetings and requesting permission for their child's attendance included in the take-home folders of students at these schools. Although the District has permitted many organizations, including several religious groups, to avail themselves of the take-home flyer forum, it denied CEF's requests, including CEF's offer to enclose the flyer in a sealed envelope. The District explained its refusals as rooted in the "religious nature" of the Good News Club and concerns about separation of church and state.

CEF then filed this action seeking a preliminary injunction to bar the District from refusing to include CEF's flyer in the students' take-home folders, and limiting access to other school forums. CEF alleged that in refusing to allow equal access to these forums, the District engaged in discriminatory treatment in violation of the Free Speech, Free Exercise, Establishment, and Equal Protection Clauses of the United States Constitution and the parallel provisions of the Maryland Constitution. The district court granted a preliminary injunction preventing the District from denying or limiting CEF's access to some

forums — back to school nights, open houses, and bulletin boards or tables generally open to other groups.

The court, however, denied CEF's request for a preliminary injunction with respect to the take-home flyer forum.[1] Although the court determined that precedent compelled its conclusion that denying CEF this access would infringe on the group's free speech rights, it decided that further hearings might lead it to ultimately conclude that the "establishment problem trumps [the] free [speech] problem." Because of this "real clash of constitutional interests," the district court held that CEF failed to demonstrate a likelihood of success on the merits.

In determining whether to grant a preliminary injunction, a court must balance: (1) the likelihood of irreparable harm to the plaintiff if the injunction is denied; (2) the likelihood of harm to the defendant if it is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. *See Direx Israel v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1992); *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 195-96 (4th Cir. 1977). We review the district court's grant or denial of a preliminary injunction for abuse of discretion, accepting the court's findings of fact absent clear error, but reviewing its conclusions of law *de novo*. Although CEF argues that the district court committed several legal errors in applying the preliminary injunction standard, given our conclusion as to one of these — assessment of CEF's likelihood of success on the merits — we need not reach the other asserted errors.

II.

CEF initially contends that barring Good News Club flyers from the take-home flyer forum constitutes viewpoint discrimination in violation of CEF's free speech rights.

The parties do not dispute the facts giving rise to this argument. Between August 2001 and February 2003, the District permitted over 225 groups to access the take-home flyer forum and circulate 415 flyers. During this time, the District only denied thirty-two requests for

---

[1]The district court also denied access to the "school wall forum," but CEF has not appealed this denial.

access to this forum; of those, thirteen were excluded specifically because they were profit-driven. The approved flyers came from groups as diverse as the American Red Cross, the Shakespeare Theatre, the Montgomery County Recreation Department, the American Diabetes Association, the Audubon Naturalist Society, and the Washington Gas Company. The topics of the flyers included information about community, charitable, and education-related activities, cultural and sporting events, and health issues. MCPS even permitted religious organizations access to this forum, allowing circulation of flyers from the Salvation Army, the Holy Redeemer Summer Play School, the Norbeck Community Church, the Cedar Lane Unitarian University Church, the Jewish Community Center, the Boy Scouts, the Girl Scouts, the YMCA, and the Boys and Girls Club.

In its appellate brief, the District maintained that it legally excluded CEF's Good News Club flyers from its take-home flyer forum. The District contended that it did not exclude the Club because of its religious viewpoint, but because the flyer forum was not open to "proselytization" or "evangelical" groups. Brief of Appellees at 57-59. At oral argument, however, the District conceded that under controlling precedent, excluding CEF's flyers from the forum constituted unconstitutional viewpoint discrimination. This concession is well-taken.

When a group seeks to speak from a religious viewpoint on a "subject otherwise permissible" in a particular forum, the government cannot constitutionally exclude the speech. *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993). CEF's flyers promote educational, cultural, and recreational activities, albeit from a religious perspective, that fit squarely within the contours of the take-home flyer forum. Given the broad access the District grants to other organizations, the Supreme Court's recent decision in *Good News Club v. Milford*, 533 U.S. 98 (2001), directly controls CEF's free speech claim.

In *Good News Club*, Milford Central School denied the Good News Club access to its after-school facilities because it deemed the Club's activities to be the "equivalent of religious instruction." *Id.* at 104. The Supreme Court held that this constituted viewpoint discrimination. *Id.* at 112. The Court explained that "speech discussing otherwise permissible subjects cannot be excluded from a limited public

forum on the ground that the subject is discussed from a religious viewpoint." *Id.* Of particular interest here, the Court noted that there is "no reason to treat the Club's use of religion as something other than a viewpoint merely because of any evangelical message it conveys." *Id.* at 112 n.4.

The District admitted at oral argument that it excluded CEF's flyers not because of their content, but because the group is evangelical and its predominate objective is proselytization. *See also* Brief of Appellees at 57-59. For this reason, as the District ultimately conceded, the Supreme Court's ruling in *Good News Club* virtually assures CEF of success on its claim that exclusion of the flyers from the take-home flyer forum constitutes viewpoint discrimination in violation of its First Amendment free speech rights. Accordingly, the District must justify this viewpoint discrimination with a compelling governmental interest in order to prevail. *Am. Life League, Inc. v. Reno*, 47 F.3d 642, 648 (4th Cir. 1995).

## III.

The District proffers a single assertedly compelling governmental interest: it contends that permitting CEF access to the take-home flyer forum would constitute the establishment of religion in violation of the First Amendment. Assuming that violation of the Establishment Clause constitutes a governmental interest compelling enough to overcome viewpoint discrimination,[2] we believe it plain, under controlling precedent, that allowing CEF access to this forum would not be likely to violate the Establishment Clause.

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. The District argues that permitting CEF access to the take-home flyer forum would violate Establishment Clause principles by sending a

---

[2]In *Good News Club*, the Court acknowledged that "a state interest in avoiding an Establishment Clause violation may be characterized as compelling," and therefore "may justify content-based discrimination," but noted that "it is not clear whether a State's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination." 533 U.S. at 112-13 (internal quotation marks and citations omitted).

message of government endorsement of a religious activity, *County of Allegheny v. ACLU*, 492 U.S. 573, 592-94 (1989); coercing participation in a religious activity, *Lee v. Weisman*, 505 U.S. 577, 587 (1992); and excessively entangling the government in a religious activity, *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971).

Less than three years ago, in *Good News Club*, school authorities in New York presented the Supreme Court with similar arguments. They contended that any viewpoint discrimination arising from their exclusion of the Good News Club from the elementary school's after-school facilities was permissible because permitting access would violate the Establishment Clause. Brief for Respondent at 16-26, *Good News Club v. Milford*, 533 U.S. 98 (2001)(No. 99-2036). The Court firmly rejected these arguments.

Initially, the Supreme Court emphasized that neutrality towards religion constitutes a "significant factor in upholding governmental programs" under the Establishment Clause. *Good News Club*, 533 U.S. at 114 (internal quotation marks and citations omitted). The Court explained that the "guarantee of neutrality is respected, not offended, when the government, following neutral criteria and even-handed policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." *Id.* (internal quotation marks and citations omitted). Because those seeking to hold Good News Club meetings in elementary schools after hours were "seek[ing] nothing more than to be treated neutrally," i.e., to obtain equal access to a forum available to other community organizations, the school administration faced "an uphill battle in arguing that the Establishment Clause compels it to exclude the Good News Club." *Id.*

Although in *Good News Club* the Court acknowledged that it had earlier noted "in the Establishment Clause context" that "elementary school children are more impressionable than adults," it explained that it had never suggested that "when the school was not actually advancing religion, the impressionability of students would be relevant to the Establishment Clause issue." *Id.* at 115-16. The Court further explained that even if elementary school "children would misperceive" affording the Good News Club access to the public elementary schools as "the endorsement of religion," this would be no

greater "danger" than the chance that "they would perceive a hostility toward the religious viewpoint if the Club were excluded." *Id.* at 118. Thus, the Court concluded that the New York school authorities could not prevail in the uphill battle to demonstrate an Establishment Clause violation, even though the case involved, as this one does, elementary school children. *Id.* at 115-19.

In view of its conceded unlawful viewpoint discrimination in denying CEF access to the take-home flyer forum, the District here faces the same "uphill battle" as the school authorities in *Good News Club*. We recognize, however, that certain facts do distinguish the case at hand from *Good News Club*. In this case the Good News Club flyers would be distributed during school hours when the law requires school attendance, while in *Good News Club*, club meetings were held immediately after school hours. *Id.* at 113. Moreover, here the students would take the flyers and permission slips home to obtain parental consent, while in *Good News Club*, no issue of this sort was litigated, the only parental consent at issue was that needed prior to attendance at Club meetings. *Id.* at 115. Finally, teachers and staff would be involved in handing out CEF's flyers, while in *Good News Club*, there was no "integration and cooperation" between school authorities and the Club. *Id.* at 116 n.6.

The District contends that these factual distinctions constitute important legal differences compelling adoption of its view that here, unlike *Good News Club*, permitting the requested equal access would constitute government endorsement, coercion, and entanglement in violation of the Establishment Clause. Those arguments might persuade us if *Good News Club* constituted the only relevant precedent controlling our decision. But it does not. Rather, several other cases from the Supreme Court and our own court provide clear guidance here.[3]

---

[3]Although not binding on us, we note that our holding accords with that of most other courts, which have held that a public elementary school does not violate the Establishment Clause by similar distributions of flyers from private religious organizations. *See Hills v. Scottsdale Unified Sch. Dist.*, 329 F.3d 1044 (9th Cir. 2003) (distribution of religious summer camp brochures would not violate Establishment Clause); *Sherman v. Cmty. Consol. Sch. Dist. 21*, 8 F.3d 1160 (7th Cir. 1993) (distribution of Boy Scout materials did not violate Establishment Clause);

In fact, in *Board of Education of Westside Community Schools v. Mergens*, 496 U.S. 226 (1990), the Supreme Court rejected an Establishment Clause challenge to communications involving all of the assertedly pivotal facts distinguishing the case at hand from *Good News Club*. A critical examination of *Mergens* and other relevant precedents requires us to conclude that the factual distinctions between the two cases lack any legal significance.

A.

The District first relies on the fact that the communication here would occur during school hours when students are compelled to attend school, not after hours as in *Good News Club*. The essential difficulty with reliance on this difference is that simply issuing a communication involving a religious organization during school hours does not render the communication state speech, nor does it invariably create a perception of endorsement or coercion by government officials. *Peck v. Upshur County Bd. of Educ.*, 155 F.3d 274, 282-83 (4th Cir. 1998).

For example, in *Mergens*, 496 U.S. at 247, the Supreme Court held that the Equal Access Act required a high school to grant "official recognition" to a student Christian club. More importantly for our purposes, the Court found that this requirement did not contravene the Establishment Clause even though under the school's policy, "official

---

*Child Evangelism Fellowship v. Stafford Township Sch. Dist.*, 233 F. Supp. 2d 647 (D.N.J. 2002) (distribution of Good News Club flyers would not violate Establishment Clause); *Daugherty v. Vanguard Charter Sch. Acad.*, 116 F. Supp. 2d 897 (W.D. Mich. 2000) (distribution of religious groups' materials did not violate Establishment Clause). Some courts, however, have held to the contrary; we do not find their rationales persuasive, and not even the dissent relies on these cases. *See Culbertson v. Oakridge Sch. Dist.*, 258 F.3d 1061 (9th Cir. 2001) (holding, with little discussion, that distribution of Good News Club permission slips would violate Establishment Clause); *Rusk v. Crestview Local Sch.*, 220 F. Supp. 2d 854 (N.D. Ohio 2002) (failing to distinguish *Good News Club* when holding that distribution of church advertisements violated the Establishment Clause and prohibiting these distributions did not violate the Free Speech Clause).

recognition" allowed the Christian club access to the school newspaper, bulletin boards, and public address system, *id.* at 247, 253; and even though, as we later noted, "[u]ndoubtedly, the distribution of the school newspaper, student viewing of school bulletin boards, and announcements over the public address system . . . all occurred *during school hours.*" *Peck*, 155 F.3d at 282 (emphasis added). Similarly, in *Brown v. Gilmore*, 258 F.3d 265, 272, 278, 282 (4th Cir. 2001), we held that requiring a minute of silence *during school hours* did not violate the Establishment Clause even when the classroom teacher advised students that the time could be used for prayer. And in *Peck*, 155 F.3d at 282, 288, we found that allowing private entities to offer Bibles to secondary school students *during school hours* did not violate the Establishment Clause.

Like the communications at issue in *Mergens*, *Brown*, and *Peck*, the CEF flyers would be distributed during "non-instructional" time (at the end of the school day), and nothing suggests that the flyers would be part of the curriculum or integrated into the teacher's instruction. Accordingly, the timing of the flyer distribution — that it would take place during school hours — cannot serve as a legally cognizable distinction from *Good News Club*.[4]

B.

The second basis on which the District argues *Good News Club* legally differs from the case at hand focuses on the level of student

---

[4]Nor does the District strengthen its argument by asserting that CEF is "us[ing] the authority of the state, through its compulsory attendance law, to provide a captive audience for the Club's advertising." Brief of Appellees at 28. The Supreme Court rejected precisely this argument in *Mergens*, 496 U.S. at 249 (noting that petitioner contended that "because the State's compulsory attendance laws bring the students together (and thereby provide a ready-made audience for student evangelists), an objective observer in the position of a secondary school student will perceive official school support for such religious meetings"), as did we in *Peck*, 115 F.3d at 282 (noting that appellants argued that making Bibles available "during school hours when state law mandates student attendance" would compel "a 'captive audience' of students to receive the religious message"). Precedent, therefore, requires us to reject it here.

"coercion." Parental consent was a necessary prerequisite to attending the after-school Christian club meetings in *Good News Club*, as it is here. The District, however, maintains that requiring students to bring CEF's informational flyers and permission slips home to their parents (an issue apparently not litigated in *Good News Club*) would amount to unconstitutional coercion.

But, of course, school administrators can "coerce" student action of all kinds without engaging in *unconstitutional* coercion; they can even require student contributions to a fund that ultimately supports a religious organization without running afoul of the Establishment Clause. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 841-46 (1995). Thus, the critical question here is not just whether the District would be "coercing" students to distribute CEF's flyers (which, in the broadest sense of the term, it would), but whether that translates into *unconstitutional* government coercion in violation of the Establishment Clause.

To resolve this question, we must determine whether the District would be coercing students "to support or participate in religion or its exercise, or otherwise act in a way which establishes a [state] religion or religious faith, or tends to do so." *Lee*, 505 U.S. at 587 (internal quotation marks and citations omitted). The Supreme Court has *only* found unconstitutional government coercion when the government singled out a religious group for a special benefit not afforded to other similarly situated non-religious groups *and* advanced an inherently religious activity, such as prayer. *See, e.g.*, *Santa Fe Indep. Dist. v. Doe*, 530 U.S. 290, 302-13 (2000); *Lee*, 505 U.S. at 587-99. Conversely, when the government has merely provided a religious group with access equal to that afforded similar non-religious groups *and* has not advanced an inherently religious activity, the Court has uniformly refused to find unconstitutional government coercion. *See, e.g.*, *Rosenberger*, 515 U.S. at 841-46; *Mergens*, 496 U.S. at 251.

Relevant Supreme Court case law thus indicates that these two factors should serve as guides in "draw[ing] the line[ ]" between the competing constitutional guarantees at issue here — permissible accommodation of private religious beliefs and impermissible government establishment of religion. *See Rosenberger*, 515 U.S. at 847-48 (O'Connor, J., concurring). Thus, first, and perhaps most importantly,

we look to the context in which the assertedly coerced activity occurs: in particular, whether the government is granting preferential treatment to a religious organization or merely providing equal access. Second, we must also examine the character of the activity itself: in this case, the student distribution of CEF's informational flyer.

1.

To determine whether government has engaged in unconstitutional coercion, we must initially view the purportedly coerced activity in context. *See, e.g.*, *Zelman v. Simmons-Harris*, 536 U.S. 639, 656 (2002) (explaining that in assessing whether Ohio's voucher program imposes unconstitutional coercion, "[t]he Establishment Clause question . . . must be answered by evaluating *all* options Ohio provides Cleveland schoolchildren, only one of which is to obtain a scholarship and then choose a religious school") (emphasis in original); *Lynch v. Donnelly*, 465 U.S. 668, 680 (1984) (determining whether a city-erected holiday display, which included a crèche, violated the Establishment Clause and refusing to consider the crèche in isolation because "[f]ocus[ing] exclusively on the religious component of any activity would inevitably lead to its invalidation under the Establishment Clause").

In an equal access case, like this one, context is particularly revealing because providing access to a "broad . . . spectrum of groups is an important index of secular [rather than religious] effect." *Widmar v. Vincent*, 454 U.S. 263, 274 (1981); *accord Rosenberger*, 515 U.S. at 843-44.[5] Indeed, the Supreme Court has *never* found unconstitutional coercion in an equal access case. *See, e.g.*, *Rosenberger*, 515 U.S. at 841-42; *Mergens*, 496 U.S. at 251. This does not mean that an equal access case could not pose Establishment Clause concerns, but only that equality of treatment is critical when assessing whether

---

[5]Thus, the prayer cases, on which the District so heavily relies, do not provide an appropriate analogue. Those cases did not involve equal access; rather, government officials there granted an inherently religious activity (prayer) *sole* access to student audiences. *See Santa Fe*, 530 U.S. 290; *Lee*, 505 U.S. 577; *Mellen v. Bunting*, 327 F.3d 355 (4th Cir. 2003); *see also Lee*, 505 U.S. at 586 (recognizing the distinction between "accommodation" cases and "prayer and religious exercise" cases).

government authorities have properly "accommodat[ed]" private "religious beliefs" or engaged in unconstitutional coercion by pervasively involving themselves in religious activity, so as to "creat[e] a state-sponsored and state-directed religious exercise in a public school." *Lee*, 505 U.S. at 586-87.

Here, it is evident that requiring participation in the take-home flyer forum does not single out CEF for a special benefit not afforded other similarly situated groups. As participants in the take-home flyer forum, students are asked to retrieve (with the hope they will take home) a variety of materials including their homework, classwork, art work, other school-related information, and flyers from more than 225 organizations. Over the course of a year-and-a-half, students received approximately 415 flyers promoting environmental, athletic, artistic, and religious activities. Directing them to take home these diverse materials does not coerce them to engage in a religious activity, any more than it coerces them to engage in an environmental activity.[6] *Cf. Widmar*, 454 U.S. at 274 (agreeing that an open access policy including a religious group "would no more commit the University . . . to religious goals than it is now committed to the goals of the Students for a Democratic Society, the Young Socialist Alliance, or any other group eligible to use its facilities") (internal quotation marks and citation omitted).

Thus, just as the government does not "coerce" a religious activity by *requiring* students to pay fees used to fund expenses of all student publications, including a magazine established to "provide a unifying focus for Christians," *Rosenberger*, 515 U.S. at 826, 842, so too it does not "coerce" a religious activity by *requiring* students to take home a host of flyers and other materials, including CEF's informational flyer. *See also Mergens*, 496 U.S. at 247, 251 (*requiring* students to listen to all student announcements, including an

---

[6]Of course, there is a constitutional "difference . . . between coercing religious activity and coercing environmental activity," *post* at 22, but that does not in any way diminish the force of this comparison — just as requiring students to carry home an environmental flyer does not make the delivery of that flyer an environmental activity, so too requiring them to carry home a religious flyer does not make that delivery, in and of itself, a religious activity.

announcement inviting students to an after-school religious club meeting, does not amount to unconstitutional coercion).

2.

Looking beyond this broader context to the character of the particular "coerced" activity at issue further demonstrates that requiring students to pick up CEF's flyer and bring it home simply does not require them to "support or participate in *religion or its exercise*." *Lee*, 505 U.S. at 587 (emphasis added). Unlike the cases in which the Supreme Court has found unconstitutional coercion, students here would not be participating in an inherently religious activity. They would not be forced to engage in any formal religious exercise; they would not be made to read the Bible or to pray, nor would they be bound to sit by while other students or faculty pray. *See Santa Fe*, 530 U.S. 290; *Lee*, 505 U.S. 577; *Mellen*, 327 F.3d 355. They would not be required, or even encouraged, to accept a religious tract, or asked to read or listen to a religious message. *See Berger v. Rensselaer Cent. Sch. Dist.*, 982 F.2d 1160, 1164 (7th Cir. 1993). In fact, as the District expressly (and properly) acknowledged at oral argument, CEF's flyers contain *no* evangelical or overtly religious language.

We recognize, of course, that the flyers can be characterized as an invitation to participate in a religious activity. However, our precedents make clear that receipt of an invitation to a religious activity (with the hope that students will deliver the invitation to their parents) simply does not rise to the level of "support or participat[ion] in religion or its exercise."[7] *Cf. Mergens*, 496 U.S. at 247 (holding, in the

[7]To the extent that our friend in dissent seeks to characterize the students as "participating in" or "supporting" *CEF's* religious activity, i.e. distributing flyers with a religious purpose, this argument also fails. As support for this argument, the dissent relies exclusively on cases recognizing a religious group's *Free Exercise* right to distribute religious tracts and flyers. *See post* at 24-25. But none of the dissent's cases suggest, let alone hold, that a person "participates in" or "supports" "religion or its exercise," simply by *receiving* flyers and *passing them on* to another person. Indeed, any such argument would be foreclosed by *Mergens*. For there, students were also "coerced" to "participate in" or "support" a religiously motivated person's issuance of an *invitation* to attend an after-

face of an Establishment Clause challenge, that school authorities could require students to listen to the public address announcement inviting them to an after-school religious club); *Brown*, 258 F.3d at 278 (rejecting Establishment Clause challenge even though teachers required students to remain in their classroom while learning of an invitation to use a minute of silence to pray). That neither *Mergens* nor *Brown* required the students to *deliver* the invitation to their parents does not lessen their force here because delivery does not convert an invitation into a religious act. A student who receives a Good News Club flyer and delivers it to his parents is no more engaging in a religious activity than a child who receives the same flyer from a street-corner evangelist and turns to give it to his mother. In both of these cases, the children are merely delivering an invitation to participate in a religious activity, not engaging in that activity.[8]

---

school religious club meeting. But, despite this, the Court found "little, if any, risk of official state . . . coercion." *Mergens*, 496 U.S. at 251; *see also id.* at 261 (Kennedy, J., concurring) (explaining that "enforcement of the [Equal Access Act] will [not] result in the coercion of any student to participate in a religious activity").

The sole rationale the dissent offers for disregarding *Mergens* is that the students in *Mergens* could sit "passively" when listening to the "religious" announcement, while here students would be forced to take a "demonstrative act." *See post* at 28. This minor factual difference is of no legal consequence. For a student's act need not be "demonstrative" to constitute participation in, or support of, a religious activity. After all, as the dissent itself recognizes, in *Lee* the Court held that students were forced to participate in a religious activity — prayer — even though they merely sat passively while other students prayed around them. *See post* at 25-26 (citing *Lee*, 505 U.S. at 593; *id.* at 637 (Scalia, J., dissenting)).

[8]The dissent disagrees, contending that both the student and the hypothetical child are, in fact, engaging in a "religious" activity by actively distributing the flyers. But, although a child can certainly "*participate* in a religious activity without having any religious motivation for his *participation*," *see post* at 25 (emphases added), religious motivation is essential to characterizing the activity *itself* as religious. Otherwise, under the dissent's expansive definition, a mailman would be engaging in a "religious" activity every time he delivered a religious flyer or pamphlet. That the mailman is not "coerced to deliver any mail," *post* at 27 n.*, is immaterial because the presence of coercion does not transform an otherwise secular activity into a religious act.

The Supreme Court itself has implicitly recognized the importance of this distinction. In *Santa Fe*, the Court found unconstitutional coercion of religion when a school, *after* school hours, broadcast *prayer* (an inherently religious activity) over its public address system, 530 U.S. at 307-08, while in *Mergens*, the Court found *no* constitutional problem when a school, *during* school hours, broadcast an announcement merely *inviting* students to participate in a religious activity over the same medium — the public address system, 496 U.S. at 247.

In sum, requiring students to carry home, among other items, a flyer containing an invitation to participate in a religious activity — an invitation that cannot be accepted absent parental consent — does not coerce religious activity in violation of the Establishment Clause. Indeed, if requiring students to bring home this invitation can be deemed coercion of a religious activity solely because the ultimate goal of the organization initiating the distribution is of a religious character, then a number of the other flyers that the District required children to carry home (e.g., from the Holy Redeemer Nursery School, the Academy of the Holy Cross, Catholic University, Columbia Union College, the Norbeck Community Church, Cedar Lane Unitarian University Church, the Jewish Community Center, the Salvation Army, the Boy Scouts, the Girl Scouts, the YMCA, and the Boys and Girls Club) would also violate the Establishment Clause. Tellingly, neither the District nor the dissent so contend.

## C.

Finally, the District emphasizes the school's "plenary control" over the take-home flyer forum, and the teachers' "active" role in picking up the flyers from their mailboxes and distributing them to the students, contrasting these facts to the lack of "integration and cooperation" between school authorities and the Club in *Good News Club*, 533 U.S. at 116 n.6. Because of the teachers' greater role here, the District maintains that affording CEF access to the take-home flyer forum would constitute unconstitutional endorsement of religion and would unconstitutionally entangle the school authorities in a religious activity.

But, once again, precedent teaches otherwise. In *Mergens*, the school authorities certainly had "plenary control" over the public

address system. Moreover, the provisions of the Equal Access Act under attack in *Mergens* permit teachers to perform a custodial oversight function to maintain order and ensure good behavior during religious after-school meetings. 496 U.S. at 253. Yet in *Mergens*, the Supreme Court upheld the Equal Access Act and concluded that this teacher involvement did not impermissibly entangle government officials in the administration of religious activities or otherwise violate the Establishment Clause. *Id.*

The District attempts to distinguish *Mergens* by characterizing the teacher involvement there as "non-participatory" compared to the teachers' "active" role in this case. But, when we examine the substance of the teachers' participation, the teachers' role in *Mergens* arguably raises more endorsement and entanglement concerns than their involvement here. Under the statute upheld in *Mergens*, teachers would actually be present *during* the religious meetings in a disciplinary capacity. 496 U.S. at 253. Thus, from a student's perspective, his public school teacher would not only attend a religious club's meeting, but would play a truly "active" role when students misbehaved. *See also Brown*, 258 F.3d at 278 (holding that teacher could engage in a more participatory role than that involved in this case, i.e., advising students of their option to pray during the mandatory minute of silence). Here, in contrast, teachers only act in an administrative capacity — picking up flyers from their mailboxes and distributing them to students' cubbies. And, as part of this same administrative function, teachers also distribute students' homework, classwork, and flyers from other "non-proselytizing" religious organizations and secular groups. It is not even clear that students witness the distribution. This minimal activity certainly involves no more endorsement or entanglement than the teachers' duties in *Mergens* or *Brown*, and therefore does not meaningfully distinguish this case from *Good News Club*.

The District also attempts to distinguish *Mergens* based on the age of the students, but, as noted above, in *Good News Club* itself the Supreme Court rejected the "suggestion that, when [as here] the school was not actually advancing religion, the impressionability of students would be relevant to the Establishment Clause issue." *Good News Club*, 533 U.S. at 116; *see ante* at 9; *see also Brown*, 258 F.3d

at 277 (upholding, on basis of *Good News Club*, statute requiring mandatory minute of silence in elementary schools).[9]

### D.

In sum, we see no meaningful way to distinguish this case from controlling precedents. Case law teaches that, notwithstanding the time and manner of the flyer distribution, allowing CEF access to the take-home flyer forum would not likely violate the Establishment Clause.[10]

### IV.

For all of these reasons, we must reverse the district court's denial of a preliminary injunction and remand the case for further proceedings in accordance with this opinion.

*REVERSED AND REMANDED*

MICHAEL, Circuit Judge, dissenting:

The Establishment Clause forbids a state from coercing "anyone to support or participate in religion or its exercise." *Lee v. Weisman*, 505 U.S. 577, 587 (1992). If the Montgomery County Public Schools (the

---

[9]Moreover, because in the case at hand students would never view the flyers without parental consent (since CEF will place them in sealed envelopes), the age of the students is constitutionally immaterial. *Cf. Peck*, 155 F.3d at 287 n.* (reluctantly distinguishing among elementary and secondary school students when Bibles were immediately accessible to the students). As in *Good News Club*, parents control whether their children have access to the flyers, and as a result parents constitute the relevant audience for Establishment Clause purposes. Because parents are less likely than secondary school students to believe school authorities endorse religion by granting CEF equal access, there is even less concern of perceived endorsement here than in *Mergens*. *Compare Good News Club*, 533 U.S. at 115 *with Mergens*, 496 U.S. at 250.

[10]Because we hold that CEF is entitled to preliminary relief on its claim under the Free Speech Clause, we do not address its other constitutional challenges.

School System) give Child Evangelism Fellowship of Maryland, Inc. (CEF) access to the School System's take-home flyer forum, elementary students will be required to distribute CEF's religious flyers to their parents. The students, in other words, will be coerced to participate in a religious activity in violation of the Establishment Clause. The School System's interest in avoiding the Establishment Clause violation, and thereby protecting the individual freedom of the students, is sufficiently compelling to justify the viewpoint discrimination that would result by denying CEF access to the forum. I therefore respectfully dissent from the majority's decision to reverse the district court's order denying CEF a preliminary injunction that would give the organization access to the flyer forum.

## I.

I disagree with the majority's conclusion that giving CEF access to the School System's flyer forum — which means that students will be forced to deliver CEF's religious flyers to their parents — is not likely to violate the Establishment Clause. It is "beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'" *Lee*, 505 U.S. at 587 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 678 (1984)). If CEF has access to the forum, the School System will impermissibly coerce its students both to participate in and to support CEF's mission "to evangelize boys and girls with the Gospel of the Lord Jesus Christ and to establish (disciple) them in the local church for Christian living." J.A. 516.

CEF participation in the School System's flyer forum means that students will be required to deliver flyers soliciting their parents to send them to after-school meetings of the Good News Club. The majority recognizes that the CEF flyer "contain[s] an invitation to participate in a religious activity." *Ante* at 18. Thus, the flyer begins: "Your kids are invited to come to Good News Club" at their elementary school. J.A. 46. A permission slip, for a parent to sign, is included in the flyer. "Each club," the flyer tells parents, "is taught by a dedicated Christian teacher." J.A. 47. The flyer indicates the religious nature of Club meetings, where activities include "Bible adventures, missionary adventures," "Bible-oriented . . . learning and moral

object lessons," and "Bible review games." J.A. 46-47. The focus of the meetings is to bring "the Gospel message to children." J.A. 516. The children are led in Bible study, prayer, and religious song, and they are urged to accept Jesus Christ as their Savior. Club teachers report two numbers each month to CEF's regional office: the number of children attending Club meetings and "the number of children who have prayed to receive Christ." J.A. 486. It is undisputed, then, that the Club meetings are a religious activity. Distributing CEF's flyers is likewise a religious activity because the flyers are an invitation to participate in these evangelical meetings. The School System's students would therefore be coerced into participating in a religious activity if they are required to deliver CEF's flyers to their parents. The majority reaches the opposite conclusion. It says there is no unconstitutional coercion for two reasons: first, CEF would simply have equal access to the flyer forum; it would not be singled out "for a special benefit not afforded other similarly situated groups," *ante* at 15; and second, distributing CEF's flyers is not a religious activity. I respectfully disagree.

A.

The majority acknowledges that the School System would (in a broad sense) engage in coercion if it required its students to distribute the CEF flyer. *Ante* at 13. But it reasons that this coercion is permissible under the Establishment Clause because CEF would not receive "a special benefit not afforded to other similarly situated non-religious groups." *Ante* at 13. In other words, because the School System requires students to carry home materials from many community groups (the Audubon Society, as one example), it may also require them to carry home CEF's flyers. The majority thus concludes that "[d]irecting [students] to take home these diverse materials does not coerce them to engage in a religious activity, *any more* than it coerces them to engage in an environmental activity." *Ante* at 15 (emphasis added). There is a difference, however, between coercing religious activity and coercing environmental activity. The School System may, without worrying about the Establishment Clause, require students to deliver environmental flyers from the Audubon Society advertising nature classes. J.A. 564. But the Establishment Clause limits the School System's power to support religion. For that reason, the

majority's observation that CEF only seeks equal access to the flyer forum begins, rather than ends, the Establishment Clause inquiry.

The Supreme Court has never held or suggested that the government may coerce students into participating in a religious activity if both religious and non-religious groups are given equal access to the government's use of its coercive power. (The real benefit here is access to the School System's use of its power to require students to take materials home to their parents.) As the majority appears to acknowledge, the Supreme Court has yet to confront a situation where the government provides a religious group equal access to a benefit that results in government coercion of individuals to participate in a religious activity on behalf of that group. *See ante* at 13. Certainly, determining that a religious group does not receive any special benefit can provide important insight into certain Establishment Clause questions, like whether a law has a secular or religious purpose, *Widmar v. Vincent*, 454 U.S. 263, 271 (1981), and whether the government has impermissibly endorsed religion, *Board of Education v. Mergens*, 496 U.S. 226, 248 (1990) (plurality opinion). Nevertheless, the Establishment Clause is violated when the government forces a student to participate in a religious activity, even on behalf of a religious group that gets no special benefit in the process. As Justice Kennedy has explained, "it suffices to inquire whether the [government act] violates *either one* of two principles." *Mergens*, 496 U.S. at 260 (Kennedy, J., concurring) (emphasis added). *See also Lee*, 505 U.S. at 587. The first principle is that "the government cannot give direct benefits to religion in such a degree that it in fact establishes a state religion or religious faith, or tends to do so." *Mergens*, 496 U.S. at 260 (Kennedy, J., concurring) (internal quotation marks and alteration omitted). This is largely dependent on whether the benefit is available to a wide variety of groups, both non-religious and religious. *See id.* (citing one of the Court's equal access cases, *Widmar*, 454 U.S. at 273-74). The second principle is that "the government cannot coerce any [person] to participate in a religious activity." *Id.* Again, the violation of this second principle alone results in an Establishment Clause violation. This means that giving religious groups equal access to a benefit cannot avoid an Establishment Clause violation when the benefit received is access to the government's power to coerce participation in a religious activity. Otherwise, for example, public schools would be free to require all students to attend meetings of a religious club

so long as they offered the same benefit to secular clubs by requiring universal attendance at their meetings. Such a result could not be squared with the Establishment Clause. We must therefore go on to consider whether the School System's students will be engaging in a religious activity if they are required to distribute CEF's flyers.

B.

The distribution of CEF's flyers is a religious activity of high order. "The hand distribution of religious tracts [or literature]," an essential exercise in some religious movements, "is an age-old form of missionary evangelism." *Murdock v. Pennsylvania*, 319 U.S. 105, 108 (1943). Sixty years ago, the Supreme Court in *Murdock* described the hand distribution of religious tracts and flyers as "religious activity" that "occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits. It has the same claim to protection as the more orthodox and conventional exercises of religion." *Id.* at 109. In short, *Murdock* held that a person engaged in the freewill, hand distribution of religious flyers is protected by the Free Exercise Clause. At about the same time, the Supreme Court also held that the Free Exercise Clause protects, as religious activity, the sidewalk distribution of handbills containing an invitation to a religious gathering and an advertisement for religious books. *Jamison v. Texas*, 318 U.S. 413, 414-16 (1943). (I recognize, of course, that the Supreme Court now analyzes cases involving the distribution of religious literature under the Free Speech Clause rather than the Free Exercise Clause; however, the Court has never retreated from its position that distributing religious tracts or flyers is a religious activity. *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 652-53 (1981).) CEF's flyers serve a religious or evangelical purpose, just like the tracts and handbills in *Murdock* and *Jamison*. The flyers solicit parents to send their children to Good News Club meetings at school, where "a dedicated Christian teacher" will lead the children in Bible study and other religious activity. Indeed, CEF freely admits that it has "religious reasons for sending flyers home." Appellant's Br. at 69. Although the majority claims otherwise, the students' distribution of CEF's invitation to the evangelical meetings of the Good News Club is fundamentally different from other things, such as attending classes and taking tests, that the School System may constitutionally coerce its students to do. The difference

is that the CEF flyer distribution is done for the religious purpose of increasing attendance at Club meetings, where the teacher works to "evangelize [the students] with the Gospel of the Lord Jesus Christ." J.A. 515. It is inescapable that the distribution of CEF's flyers is a religious activity, just as the Club meetings themselves are a religious activity. The Supreme Court has already indicated that a public school cannot coerce its students into attending meetings of a religious club. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 115 (2001). Similarly, a public school should not be able to coerce its students into participating in the related religious activity of distributing invitations to those religious meetings.

To support its conclusion that the School System's children would not engage in a religious activity if they distributed CEF's flyers, the majority offers its hypothetical involving a street-corner evangelist. *Ante* at 17 ("A student who receives a Good News Club flyer and delivers it to his parents is no more engaging in a religious activity than a child who receives the same flyer from a street-corner evangelist and turns to give it to his mother. In both of these cases, the children are merely delivering an invitation to participate in a religious activity, not engaging in that activity."). This hypothetical is flawed for two reasons. First, it ignores the constitutional meaning of participation in a religious activity. The majority would surely agree that the street-corner evangelist is engaging in a religious activity when he hands the flyer to the child. *See Jamison*, 318 U.S. at 414-16. Thus, for the majority, the difference in the respective acts of the evangelist and the child lies in the fact that the child may not be acting with a religious motivation when he hands the flyer to his mother. *Ante* at 16-17 n.7. It is well established, however, that a child can participate in a religious activity without having any religious motivation for his participation. For instance, in *Lee* the Supreme Court was persuaded that when students were pressured to stand in respectful silence while a rabbi prayed aloud at a school graduation, the students were being coerced to participate in the prayer. *Lee*, 505 U.S. at 593. In other words, an overtly pious act was not necessary to signify participation in the prayer. *Id.*; *see also id.* at 637 (Scalia, J., dissenting) ("[The majority] does not say, for example, that students are psychologically coerced to bow their heads, place their hands in a Dürer-like prayer position, pay attention to the prayers, utter 'Amen,' or in fact pray."); *Mellen v. Bunting*, 327 F.3d 355, 362 (4th Cir. 2003) (finding imper-

missible coercion when the VMI Corps of Cadets "must remain standing and silent while the supper prayer is read, but cadets are not obliged to recite the prayer, close their eyes, or bow their heads."). Thus, although neither the child in the hypothetical nor the children in the School System may be acting out of religious motivation when they deliver the flyers to their parents, the children are nonetheless participating in a religious activity.

The second problem with the majority's hypothetical is that the child is not coerced in any way. To be comparable to this case, the hypothetical should include an element of coercion. For example, if a public school teacher walking down the street with her elementary students tells them that they must accept flyers offered by a street-corner evangelist and deliver them to their parents, the state would be compelling participation in religious activity. In the majority's hypothetical the child chooses to aid the evangelist in his distribution of flyers; in mine the state compels the children to receive the evangelist's flyers and in essence to act as his agents in delivering his flyers to their parents. In the majority's hypothetical, my hypothetical, and the present case, the children all participate in the religious activity of distributing flyers. In the majority's hypothetical, the child's act is constitutionally protected because he participates in the religious activity of his own freewill. In my hypothetical and in this case, the state's coercion of the children to participate violates the Establishment Clause.

CEF's offer to place its flyers in sealed envelopes does not avoid the Establishment Clause problem created by its participation in the flyer forum. Even with sealed envelopes, the end result is the same: students would still be commandeered by the state to participate in a religious activity. The School System will certainly know the religious nature of the flyers because it approves all flyers that students are required to distribute. The School System should not be able to coerce elementary students into participating in a religious activity just because it can conceal the religious nature of the activity from them. If anything, hiding the flyers in sealed envelopes makes the coercion even more troubling because a student would not have the knowledge to raise a pre-distribution objection if he had the courage to do that. The majority also implies that there will be no coercion of the students here because the parents will decide whether their chil-

dren will attend the Good News Club meetings. *See ante* at 12-13. This overlooks a key fact. Religious activity — distribution of flyers — occurs before any parental decision is made about attendance at the meetings. The parents play no part in deciding whether their children will be required to deliver the religious flyers.*

The majority is too quick to conclude that "[c]ontrolling precedent . . . strongly indicates that permitting CEF access to [the flyer] forum does not run afoul of the Establishment Clause." *Ante* at 4. I see nothing in the First Amendment, the Supreme Court cases, or our own circuit cases that compels or suggests the result reached by the majority today. Indeed, the cases stop far short of authorizing the state to compel anyone to take part in a religious activity. The majority relies quite heavily on the Supreme Court's decision in *Board of Education v. Mergens*, 496 U.S. 226 (1990). In *Mergens* the Court held that the Equal Access Act, 20 U.S.C. §§ 4071-4074, does not violate the Establishment Clause by requiring a high school to extend official recognition to a Christian club that would, like other extracurricular clubs, meet on school premises during noninstructional time. 496 U.S. at 249-53. The Court mentioned in passing that official recognition gave the Christian club access, among other things, to the school's public address system. *Id.* at 247. Relying on this passing reference, the majority says that *Mergens* holds that the Establishment Clause does not prevent a school from requiring all students to listen to an announcement, over the public address system, of the time and place for a meeting of a religion club. *See ante* at 16-17. That is not the holding in *Mergens*; nevertheless, because the Court did not express any constitutional concerns about the prospects of such an announcement, I am willing to assume that it had none. But even a broader interpretation of *Mergens* does not take the majority where it wants to go.

---

*The majority suggests that under my approach there would be an Establishment Clause violation every time a mailman delivered a religious flyer or pamphlet. *See ante* at 16-17 n.7. That is not the case. The mailman, in accepting employment with the U.S. Postal Service, agrees to fulfill his duty to deliver the mail. *See* 39 U.S.C. § 1011. He is therefore not coerced to deliver any mail, including mail with religious content, unlike the students in this case, who would be coerced or commandeered by the School System to deliver CEF's flyers.

The majority likens CEF's flyer to the public address announcement in *Mergens*; both invite students to participate in a religious activity. According to the majority, because CEF's flyer is simply an invitation to participate in religious activity, the School System would not violate the Establishment Clause if it forced its students to distribute the flyers. This analysis overlooks a key difference between what a student is forced to do while a *Mergens*-type public address announcement is being made and what he would be forced to do with the CEF flyer. In the first instance, the student sits passively while the time and place of a Christian club meeting is announced. Notwithstanding the majority's argument to the contrary, *see ante* at 16-17 n.7, this passivity is of consequence for what it does not signify: it does not signify that the listening student joins in the announcement or advances its purpose. In the second instance (our case), the student would be forced by his school to take the CEF flyer home to his parents; he would be forced to take a demonstrative act that advances the religious purpose of CEF. The second instance involves an Establishment Clause violation because the school is forcing the student to engage in a religious activity, the distribution of flyers. *Mergens* does not sanction the coercion in the second instance because it does not hold or imply that a school may force a student to go to the public address microphone and announce a meeting of the Christian club. In short, *Mergens* does not suggest that a school can in any way coerce its students to participate in religious activity. *Mergens* is therefore of no assistance to the majority.

Nor is the majority helped by *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819 (1995). At the end of its discussion of equal access, the majority says that "just as the government does not 'coerce' a religious activity by *requiring* students to pay fees used to fund expenses of all student publications, including a magazine established to 'provide a unifying focus for Christians,' *Rosenberger*, 515 U.S. at 826, 842, so too it does not 'coerce' a religious activity by *requiring* students to take home a host of flyers and other materials, including CEF's informational flyer." *Ante* at 15. The majority seems to be suggesting that if paying student fees is not a religious activity, then delivering religious flyers is not either. That is reading too much into *Rosenberger*. First, the Court in *Rosenberger* pointed out that whether it was constitutional to require the students to pay the activity fee was not the question presented. 515 U.S. at

840. Second, in rejecting the Establishment Clause challenge to the use of the fees, the Court relied on the fact that the government aid provided (printing services) is secular, and it reasoned that "[a]ny benefit to religion is incidental to the government's provision of [those] secular services." 515 U.S. at 843-44. Here, the benefit to CEF is not the receipt of a secular service, like printing, paid for with School System funds. Rather, the benefit is that the School System will require its elementary students to participate actively in CEF's religious mission by delivering its message (the flyers) to their parents. Again, the Supreme Court has described the distribution of flyers like CEF's as a religious activity that "occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits." *Murdock*, 319 U.S. at 109. *See also Jamison*, 318 U.S. at 414-16 (sidewalk distribution of religious handbills). What CEF wants the School System to force its children to do is much more akin to the inherently religious activity in *Murdock* and *Jamison* than it is to the payment of printing costs in *Rosenberger*.

Our circuit cases relied on by the majority, *Peck v. Upshur County Board of Education*, 155 F.3d 274 (4th Cir. 1998), and *Brown v. Gilmore*, 258 F.3d 265 (4th Cir. 2001), do not suggest or support the result the majority reaches today. In *Peck* we held that a school board did not violate the Establishment Clause when it allowed private parties to sponsor, on one day in the school year, a table of Bibles that were offered to high school students. We noted that neither the board nor the sponsors of the table were compelling or even encouraging students to take Bibles or receive its religious message. *Peck*, 155 F.3d at 282. In *Brown* we rejected an Establishment Clause challenge to the Virginia statute that requires local school boards to establish a minute of silence in classrooms to allow students the individual choices of praying, meditating, or engaging in any other silent activity. After assuming that teachers would simply inform students of all of their options, we held that the statute was not coercive because "the affected students are left to choose how they will use the minute." *Brown*, 258 F.3d at 270, 281. *Peck* and *Brown* are easily distinguishable because in those cases the students were not coerced to take religious literature or to engage in religious activity. Here, of course, the School System would violate the Establishment Clause's anti-coercion principle because forcing students to deliver CEF's flyers coerces them into participating in religious activity.

The Establishment Clause also forbids the state from coercing someone "to *support* . . . religion or its exercise." *Lee*, 505 U.S. at 587 (emphasis added). Requiring students to distribute CEF's flyers is therefore impermissible on the alternative ground that it supports a religious activity. The School System would coerce support of CEF's religious mission by forcing students to hand their parents flyers soliciting them to enroll their children in a Good News Club. In the words of CEF, "[u]nless the flyers go forth, Club attendance is small and CEF representatives cannot either evangelize or teach children Biblical character and values." Appellant's Br. at 30. Again, the majority's street-corner evangelist hypothetical helps to illustrate that the School System will be coercing children to support religion. In the hypothetical, the mother's own child, not the evangelist who is a stranger, freely hands her the religious flyer. The child's act supports the evangelist's mission. Similarly, the children in the School System will support CEF's religious mission by delivering its flyers to their parents. But the support of the students in this case will be coerced, and this violates the Establishment Clause.

## C.

I must also consider whether the School System's interest in avoiding the Establishment Clause violation justifies the viewpoint discrimination against CEF that would occur by denying it access to the flyer forum. In this instance, the Establishment Clause should prevail.

A government regulation that discriminates against private speakers based on viewpoint is subject to strict scrutiny: the regulation must be necessary to serve a compelling governmental interest by the least restrictive means available. *Am. Life League, Inc. v. Reno*, 47 F.3d 642, 648 (4th Cir. 1995). A less restrictive way to avoid an Establishment Clause violation has not been suggested in this case. CEF's offer to put its flyers in sealed envelopes is not a solution because the students would still be coerced into religious activity. Thus, the question is whether the School System's interest in preventing a violation of the Establishment Clause is sufficiently compelling to trump CEF's interest in free expression. The Establishment Clause is more likely to trump the Free Speech Clause in the "coercive context of public schools" where children are required, even conditioned, to follow direction. *Berger v. Rensselaer Cent. Sch. Corp.*, 982 F.2d

1160, 1168 (7th Cir. 1993). CEF can participate in the flyer forum only by enlisting the School System to exercise its authority over students, coercing them to engage in religious activity. The School System would thus become the force in violating the constitutional rights of its own students. To prevent that from occurring, the expressive rights of the third party, CEF, must give way. *See id.*

I recognize that providing religious groups with equal access to limited forums created by the state is an important First Amendment objective. However, in none of the Supreme Court's equal access cases was any individual forced to engage in religious activity like the students here would be. *See, e.g.*, *Good News Club*, 533 U.S. at 115 (Good News Club, like other groups, had to be given access to public school building for meetings after hours; children, however, were not coerced into engaging in religious activity because they would only attend meetings with the permission of their parents); *Rosenberger*, 515 U.S. 819 (public university must make student activity funds available to pay the printing costs of a campus organization's publication that presents the Christian viewpoint); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993) (local school board required to give religious group access to school property to show movies that would be open to the community at large); *Mergens*, 496 U.S. at 260-61 (Kennedy, J., concurring) (public school required to extend official recognition to Christian club, but "the government cannot coerce any student to participate in a religious activity."); *Widmar*, 454 U.S. 263 (state university must make facilities available for meetings of student religious group). Here, if CEF is allowed access to the flyer forum, the School System will violate the Establishment Clause when it uses its authority over students to coerce them into participating in CEF's mission to evangelize children — a mission that begins with the distribution of flyers. *See Berger*, 982 F.2d at 1168. The School System's interest in avoiding an Establishment Clause violation should prevail in order to protect the individual freedom of the students. In sum, the School System should be able to exclude CEF from the flyer forum.

Finally, even if the Establishment Clause prevails, CEF is not shut out. It has access to rooms at the schools for its Good News Club meetings. It also has access to other forums, specifically, back-to-school nights, open houses, and bulletin boards and tables, that are

open to other community groups. CEF thus has access to several forums in the School System through which it may invite parents to permit their children to attend Club meetings. CEF would only be unable to use the one forum where CEF participation would require the School System to coerce students to distribute flyers in violation of the Establishment Clause.

## D.

For all of the foregoing reasons, I conclude that CEF is not likely to prevail on the merits in this case.

## II.

As my analysis indicates, the district court correctly concluded that CEF is not likely to prevail on the merits, the third factor in the court's decision to deny CEF a preliminary injunction. *See Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 193-96 (4th Cir. 1977) (establishing a four-factor inquiry for deciding whether a preliminary injunction should issue). Because the district court properly analyzed all of the *Blackwelder* factors, I would affirm the order denying CEF a preliminary injunction against the School System.